**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3163
_____

ADORERS OF THE BLOOD OF CHRIST,
UNITED STATES PROVINCE,
N/K/A ADORERS OF THE BLOOD OF CHRIST,
UNITED STATES REGION, SUCCESSOR BY MERGER
TO ADORERS THE BLOOD OF CHRIST,
PROVINCE OF COLUMBIA, PA, INC.,
formerly known as SAINT JOSEPH'S CONVENT,
MOTHER HOUSE OF SISTER ADORERS OF THE MOST
PRECIOUS BLOOD, COLUMBIA, PA also known as
SISTERS ADORERS OF THE MOST PRECIOUS BLOOD,
ST. JOSEPH CONVENT, COLUMBIA, PA formerly known
as SAINT JOSEPH CONVENT MOTHERHOUSE
OF THE ADORERS OF THE BLOOD OF CHRIST,
COLUMBIA, PENNSYLVANIA, INC.;
SISTER DANI BROUGHT; SISTER MARY ALAN
WURTH; SISTER SARA DWYER; SISTER MARIA
HUGHES; SISTER THERESE MARIE SMITH,

Appellants

v.

FEDERAL ENERGY REGULATORY COMMISSION;
COMMISSIONER OF THE FEDERAL ENERGY

REGULATORY COMMISSION; TRANSCONTINENTAL
GAS PIPE LINE COMPANY, LLC,
C/O CT CORPORATION SYSTEM
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 5-17-cv-03163)
District Judge:  Honorable Jeffrey L. Schmehl
_____

Argued January 19, 2018
_____

Before:  SMITH, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges*

(Opinion Filed: July 25, 2018)

J. Dwight Yoder, Esq. [Argued]
Gibbel, Kraybill & Hess
2933 Lititz Pike
P.O. Box 5349
Lancaster, PA 17606
        *Counsel for Appellants*

Susanna Y. Chu, Esq. [Argued]
Robert H. Solomon, Esq.
Federal Energy Regulatory Commission
888 1st Street, N.E.
Washington, DC 20426

*Counsel for Appellees Federal Energy Regulatory Commission and Commissioner Federal Energy Regulatory Commission*

Elizabeth U. Witmer, Esq. [Argued]
Saul Ewing Arnstein & Lehr
1200 Liberty Ridge Drive
Suite 200
Wayne, PA 19087

Patrick F. Nugent, Esq.
Sean T. O'Neill, Esq.
John F. Stoviak, Esq.
Saul Ewing Arnstein & Lehr
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102
*Counsel for Appellee Transcontinental Gas Pipe Line Company, LLC*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

Under the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717–717z, the Federal Energy Regulatory Commission ("FERC") has the power to issue "certificates of public convenience and necessity" authorizing private developers to construct, operate, and maintain interstate natural gas pipeline projects. *See* 15 U.S.C. § 717f(c). But before FERC may grant such a certificate, it must, in most circumstances, set the matter for a hearing and provide reasonable notice to interested parties. *Id.* § 717f(c)(1)(B). If FERC ultimately issues the certificate following the requisite hearing, any aggrieved person may seek judicial review of its decision—either in the Court of Appeals for the District of Columbia Circuit or the circuit wherein the natural gas company is located or has its principal place of business. *Id.* § 717r(b). The statute provides that the chosen court of appeals then has "exclusive" jurisdiction "to affirm, modify, or set aside" FERC's order. *Id.* § 717r(b), (d)(1). Prior to seeking review in the relevant court of appeals, however, the aggrieved party must, within thirty days of the issuance of the certificate, apply for rehearing before FERC. *Id.* § 717r(a). Anyone who fails to first seek rehearing before FERC is statutorily barred from later seeking judicial review. *See id.*

In this case, the Appellants are the Adorers of the Blood of Christ (the "Adorers"), a vowed religious order of Roman Catholic women that owns a parcel of land in Columbia, Pennsylvania affected by FERC's decision to issue a certificate of public convenience and necessity to Transcontinental Gas

Pipe Line Company, LLC ("Transco"), authorizing the company to construct a roughly two-hundred-mile-long pipeline ("Pipeline Project" or "Project").  The Adorers object to the use of their land as part of the Project, explaining that their deeply-held religious beliefs require that they care for the land in a manner that protects and preserves the Earth as God's creation.  But despite receiving notice of the proposed project, the Adorers never raised this objection before FERC.  Instead, over five months after FERC granted Transco the certificate, the Adorers filed suit in the District Court for the Eastern District of Pennsylvania, raising a claim under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1.  The District Court promptly dismissed the Adorers' complaint, concluding that it lacked subject matter jurisdiction in light of the NGA's specific provisions addressing judicial review of FERC orders.

On appeal, the Adorers contend that the District Court erred because their RFRA claim raises a federal question, over which the court had jurisdiction pursuant to 28 U.S.C. § 1331.  We disagree, and hold that a RFRA cause of action, brought by invoking a court's general federal question jurisdiction, does not abrogate or provide an exception to a specific and exclusive jurisdictional provision prescribing a particular procedure for judicial review of an agency's action.  Accordingly, we will affirm the order of the District Court.

**I[1]**

---

[1] "In an appeal from a grant . . . of a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), this Court reviews only whether the allegations on the face of the complaint, taken as true, allege sufficient facts to

5

## A

The Pipeline Project proposed by Transco consists of 199.5 miles of new pipeline in Pennsylvania connecting to existing pipelines running to South Carolina. The Pipeline Project is marketed as potentially supplying more than seven million American homes with enough natural gas to meet their daily needs by connecting natural gas producing Pennsylvania regions to markets in the mid-Atlantic and southeastern states.

The Pipeline Project consists of many subsections, including "Central Penn Line South," a proposed 127.3-mile section of the Project that will run from Lancaster County, Pennsylvania to Columbia, Pennsylvania, with a forty-two-inch diameter capable of transporting 1.7 dekatherms (billion cubic feet) of natural gas per day, and a maximum operating pressure of 1,480 pounds per square inch. The subsection would facilitate the extraction, harnessing, transportation, and use of natural gas. The Pipeline Project would run through the Adorers' property in Columbia, Pennsylvania.

## B

On July 29, 2014, FERC published a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Atlantic Sunrise Expansion, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* ("NOI") in the *Federal Register*, *see* 79 Fed. Reg. 44,023 (2014), and mailed it to nearly 2,500 interested parties,

---

invoke the jurisdiction of the District Court." *Oss Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 761 n.2 (3d Cir. 2010).

including affected property owners, to provide notice of the proposed Pipeline Project. The NOI provided a synopsis of the Pipeline Project and a preliminary list of issues identified by FERC's staff. It also described the environmental review process, invited written comments on issues that should be addressed, listed the date and location of four public meetings to be held in the area surrounding the Project, and provided a deadline of August 18, 2014, for all comments.

According to FERC, it received over six hundred written comments from various interested parties, and ninety-three speakers provided comments at the scoping meetings held between August 4 and 7, 2014. The Adorers did not provide a written comment or attend any one of these meetings.

Transco filed its project application with FERC for a certificate of public convenience and necessity for the Pipeline Project on March 31, 2015. On October 22, 2015, FERC mailed letters to landowners potentially affected by the proposed Pipeline Project. The letter briefly described proposed project reroutes under consideration, invited newly affected landowners to participate in the environmental review process, and provided a special thirty-day limited scoping period. Among the recipients of the October 22, 2015 letter were the Adorers, who failed to respond to the letter.

The Adorers are "an ecclesial group of women living in community" and practicing their deeply-held religious convictions, App. 28, "whose religious practice includes protecting and preserving creation, which they believe is a revelation of God," App. 24. They believe that "God calls humans to treasure land as a gift of beauty and sustenance that should not be used in an excessive or harmful way." App. 24.

7

Part of their practice is to "protect, preserve and treasure the land that [they] own."  App. 24.

The Adorers own the parcel of land in Columbia, Pennsylvania that is at issue here.  The land has been used to sponsor the St. Anne's Retirement Community, and for growing crops by local farmers.  The Adorers assert that their intentional decision on how to use the land "is an integral part of exercising their well-established and deeply-held religious beliefs as active and engaged stewards of God's earth."  App. 32.

In 2015, the Adorers followed an encyclical[2] letter titled "*Laudato Si*' of the Holy Father Francis on Care for our Common Home," written by Pope Francis.  In the letter, Pope Francis provides a comprehensive theological basis that, as an act of religious belief and practice, members of the Roman Catholic Church must preserve the Earth as God's creation.  Specifically, Pope Francis identifies that climate change based, among other things, "on the great concentration of greenhouse gases related mainly as a result of human activity" and "aggravated by a model of development based on the intensive use of fossil fuels . . . is a global problem."  Pope Francis, *Laudato Si*' of the Holy Father Francis on Care for our Common Home 18–19, 20–21 (2015).  Accordingly, the letter makes a calling "to devise larger strategies to halt

_____

[2] An encyclical letter is a letter sent by a bishop or high church official that treats a matter of grave or timely importance and is intended for extensive circulation. *Encyclical*, Webster's Third New International Dictionary 747 (4th ed. 1976).

8

environmental degradation and to encourage a 'culture of care' which permeates all of society." *Id.* at 166–67.

On May 5, 2016, FERC issued a draft Environmental Impact Statement ("EIS") addressing the issues raised during the scoping period and up to its publication. Notice of the draft EIS was published in the *Federal Register* on May 12, 2016, and mailed to the affected parties, several environmental entities, as well as to additional affected parties that were added after the issuance of the NOI. FERC then held four public comment meetings between June 13 and June 16, 2016, where approximately 203 speakers provided comments regarding the draft EIS. FERC also received over 560 written comments from affected parties regarding the draft EIS. As a result of the oral and written comments, FERC postponed the issuance of the final EIS, and nearly 100 additional comments were filed related to the Pipeline Project. The Adorers failed to provide a comment or otherwise participate in any of these fora.

On February 3, 2017, FERC issued an "Order Issuing Certificate" to Transco authorizing the construction and operation of the Pipeline Project. Among other things, the Order granted Transco the right to take private property on the Pipeline Project by eminent domain, should landowners refuse to voluntarily convey a right to use their land. *See* 15 U.S.C. § 717f(h).

Based on the issuance of the Order, the Adorers refused to grant Transco an easement on the land to begin construction.[3] On April 14, 2017, Transco initiated

---

[3] The Adorers aver that they have "consistently and repeatedly denied all monetary offers from Transco to acquire their Property and made it clear that, as a matter of religious

9

condemnation proceedings against them in the Eastern District of Pennsylvania, pursuant to the NGA and Federal Rule of Civil Procedure 71.1. Two months later, given that the Adorers had failed to answer the complaint or file any sort of responsive motion, Transco filed an "Emergency Motion for Default Judgment and for Possession of Rights of Way in Unopposed Condemnation Action," and soon after moved for a preliminary injunction for possession of those rights of way, which the Adorers opposed. The District Court then issued an order granting Transco's right to condemn the relevant section of the Adorers' land on July 7. On August 23, the District Court entered a preliminary injunction granting Transco access to and the rights of way on the Adorers' land upon the posting of a bond in the amount of $329,220 (which Transco paid one week later).

The Adorers did not object, appeal or seek rehearing regarding any order issued related to these condemnation proceedings.

Instead, on July 14, 2017, a week after the District Court issued the order granting Transco's right to condemn, the Adorers filed their own complaint against FERC in the Eastern District of Pennsylvania seeking declaratory judgment, alleging that FERC violated their rights under RFRA, and additionally seeking injunctive relief preventing the Pipeline Project from running across their land. They later filed an

---

conviction, no amount of money would change their mind." Adorers Br. 14.

10

amended complaint reiterating the same claims, listing additional plaintiffs, and adding Transco as a defendant.[4]

In the amended complaint, the Adorers claimed that allowing Transco to complete the Pipeline Project would interfere with their ability to use their land in a manner consistent with their religious beliefs. In particular, the Adorers alleged that the drilling and subsequent extraction of natural gas from wells in the land would cause leakage of methane. This leakage, they contended, would contribute to global warming in a manner contrary to their religious beliefs. The Adorers also alleged that the expansion of natural gas would be harmful to the environment by accelerating global warming and consequently harming the Earth and humans.

On September 28, 2017, the District Court in the RFRA action granted FERC's and Transco's motions to dismiss for

---

[4] We need not reach the issue of whether a holder of a section 7 certificate fully assumes the role of a state actor when exercising eminent domain rights. While RFRA, by its terms, only applies to state actors, *see* 42 U.S.C. § 2000bb-1 ("Government shall not substantially burden a person's exercise of religion . . . ."), Transco did not raise a state-actor defense in its briefs or even invoke one in response to questioning at oral argument, *see* Oral Argument at 30:22–31:25, *Adorers of the Blood of Christ v. F.E.R.C.*, No. 17-3163, http://www.ca3.uscourts.gov/oral-argument-recordings. Thus, the issue of whether an entity in Transco's position qualifies as a state actor—which we have previously recognized is an open question in our circuit, *see Goadby v. Phila. Elec. Co.*, 639 F.2d 117, 120 n.2 (3d Cir. 1981)—is one we will leave for another day.

11

lack of subject matter jurisdiction. The court held that RFRA did not allow the Adorers to circumvent the specific procedure prescribed by the NGA for challenging a FERC order. In other words, the Adorers' RFRA claim did not change the basic fact that, under the NGA, "no entity may seek judicial review of a FERC order unless it first sought rehearing from the agency." App. 8. Because the Adorers had failed to seek FERC rehearing, the court concluded that it was foreclosed from hearing their claims. The Adorers then filed this appeal.

## II[5]

According to the Adorers, the District Court erred in dismissing the complaint for lack of subject matter jurisdiction because RFRA grants them a statutory right to assert an appropriate claim in district court. The NGA, they contend, cannot be used to foreclose that statutory right because Congress explicitly provisioned RFRA to supersede all other Federal law. Thus, to the extent that RFRA and the NGA conflict, the Adorers argue that the latter must yield. While we agree that the NGA would have to necessarily yield to RFRA if the two statutes indeed conflicted, we conclude that the two statutes do not conflict. Rather, the NGA merely provides for complementary procedural requirements that a claimant must

---

[5] "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]'" *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 177 (3d Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

12

adhere to when exercising their RFRA right to a "judicial proceeding." 42 U.S.C. § 2000bb-1(c).

"When reviewing an order dismissing a claim for lack of subject matter jurisdiction, we exercise plenary review over legal conclusions and review findings of fact for clear error." *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010).

We begin by examining the two statutory schemes that the Adorers argue are in conflict. Section 7 of the NGA grants FERC the authority to approve or deny the construction of interstate natural gas pipelines. *See* 15 U.S.C. § 717f. Indeed, before a private developer can begin construction on any pipeline project, FERC must grant the developer a "certificate of public convenience and necessity," *id.* § 717f(c)(1)(A)— also referred to as a "section 7 certificate" or a "certificate." FERC may grant a certificate only upon a finding that the project at issue will serve the public interest of convenience and necessity. *Id.* § 717f(e). FERC may also "attach to the issuance of the certificate . . . reasonable terms and conditions as the public convenience and necessity may require." *Id.* § 717f(e).

Once FERC has issued a certificate to a developer, the certificate holder has the ability to acquire "the necessary right-of-way to construct, operate and maintain a pipe line or pipe lines" from unwilling landowners by eminent domain. *Id.* § 717f(h). As such, any party who is "aggrieved" by a FERC certificate may seek redress by petitioning the federal court of appeals, which would have "exclusive" jurisdiction "to affirm, modify, or set aside" the certificate, provided that the party first seek rehearing before FERC. *Id.* § 717r(a)-(d); *id.* § 717r(b)

13

("Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States . . . by filing in such court, within sixty days after the order of the Commission upon application for rehearing[.]").

RFRA, meanwhile, instructs that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the burden "is the least restrictive means" to further a "compelling government interest." 42 U.S.C. § 2000bb-1(a)–(b). The statute's judicial relief provision further provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." *Id.* § 2000bb-1(c).

**III**
**A**

The Adorers contend that the plain language of this judicial relief provision grants them a statutory right to assert their RFRA claim in district court. We disagree. The NGA is a detailed statute, setting forth specific provisions on the procedure by which approval and subsequent review of a pipeline project may be attained. The statute provides that "[a]ny party . . . aggrieved by an order issued by the Commission . . . may obtain a review of such order in the court of appeals of the United States . . . by filing in such court, within sixty days after the order of the Commission upon application for rehearing." 15 U.S.C. § 717r(b). Once issued, the FERC order was undoubtedly under the exclusive purview of the NGA's provision for appellate review of the circuit

14

courts of appeals. *See id.* RFRA, on the other hand, provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a *judicial* proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c) (emphasis added). Nowhere does the text specifically confer jurisdiction to the federal district courts to hear RFRA claims.[6]

As such, the NGA's procedural regime is controlling here. It explicitly states that jurisdiction is "exclusive" with "the court[s] of appeals of the United States." 15 U.S.C. § 717r(b). Moreover, the statute's exhaustion provision, requiring that objections to FERC's order be "urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do" before appellate review,

---

[6] Were we to interpret RFRA's reference to a "judicial proceeding" as necessarily requiring a district court hearing, we would have to conclude that the NGA unlawfully conflicted with RFRA. *See* 42 U.S.C. § 2000bb-3(a) ("This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."). But the NGA's procedural requirements, which permit parties to seek review in a court of appeals following an initial agency hearing, qualify as a "judicial proceeding" under RFRA. Although an agency proceeding alone would not qualify as such a "judicial proceeding," we conclude that the NGA's "FERC + Court of Appeals" framework so qualifies. In this sense, then, the NGA and RFRA do not conflict with each other. Rather, the NGA simply lays out what procedural rules a claimant must adhere to when exercising their RFRA right to a "judicial proceeding" in the pipeline context.

*id.*, makes clear Congress' intent to confer exclusive jurisdiction to the NGA by a highly reticulated statute nullifying any procedural alternatives an aggrieved party may otherwise have.  Indeed, the NGA is the exclusive remedy for matters relating to the construction of interstate natural gas pipelines.  It forms the paradigm by which FERC operates in matters related to interstate natural gas pipelines.  By failing to avail themselves of the protections thereunder, the Adorers have foreclosed judicial review of their substantive RFRA claims.

Besides, even if the NGA did not expressly preclude jurisdiction in this case, we would nonetheless find that it did so implicitly under the two-step framework provided in *Thunder Basin Coal v. Reich*, 510 U.S. 200 (1994).  At the first step, the court asks whether Congress' intent to preclude district court jurisdiction is "fairly discernible in the statutory scheme," based on an examination of the statute's text, structure, and purpose.  *Id.* at 207.  The second step, in turn, asks whether plaintiffs' claims "are of the type Congress intended to be reviewed within this statutory structure."  *Id.* at 212.  At this stage the court considers three factors:  (1) whether the statutory scheme "foreclose[s] all meaningful judicial review;" (2) the extent to which the plaintiff's claims are "wholly collateral" to the statute's review provision; and (3) whether "agency expertise could be brought to bear on the . . . questions presented."  *Id.* at 212–13.

Here, Congress' intent to vest jurisdiction in circuit courts is "fairly discernible in the" NGA.  *See Thunder Basin*, 510 U.S. at 207 (setting forth first prong of two-part test).  Only "the court of appeals of the United States" where the natural gas company is located or has its principal place of business or the District of Columbia Circuit may "affirm, modify, or set

aside [a FERC] order in whole or in part." § 717r(b). By challenging the permissibility of the Pipeline Project under RFRA, the Adorers are seeking to "modify or set aside" FERC's order—a matter the NGA places in the "exclusive" purview of the court of appeals, only after administrative exhaustion.

At step two, we think the Adorers' claims "are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. First, the statutory authority, the NGA, does not foreclose all meaningful judicial review because it vests the courts of appeals with jurisdiction to review FERC orders. *See id.* at 212–13. Second, the claims asserted here are not "wholly collateral" because they "inhere in the controversy;" that is, if the Adorers are successful in their administrative challenge, the FERC order will be modified or set aside. *Id.* Finally, although the constitutional claims may be outside of FERC's expertise, this is tempered by the court of appeals's review, which regularly resolves constitutional issues. *See Massieu v. Reno*, 91 F.3d 416, 420 n.4 (3d Cir. 1996) ("[T]he [*Thunder Basin*] Court's fundamental point, we think, was that both statutory and constitutional claims could be meaningfully addressed in the court of appeals."); *see also Elgin v. Dep't of Treas.*, 567 U.S. 1, 19 (2012) ("We see nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question to which the facts pertain.").

We are therefore not convinced that "the plain language of RFRA" grants the Adorers, Adorers Br. 22, the statutory right to assert their RFRA claim in a federal district court. As the Supreme Court has explained, the general "principle" that, "when federal law creates a private right of action . . . district

courts possess federal-question jurisdiction under § 1331," is one that does not "endure[]" where "Congress divests federal courts of their § 1331 adjudicatory authority." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378–79 (2012). Thus, we reject the Adorers' contention that the District Court committed an error of law when it applied the provisions of the NGA to conclude it lacked subject matter jurisdiction to hear their substantive RFRA claims.[7]

---

[7] This analysis is consistent with our decision in *Francis v. Mineta*, 505 F.3d 266 (3d Cir. 2007). In *Francis*, we noted that "Congress did not intend RFRA to subsume other statutory schemes," and thereby acknowledged that "nothing in RFRA alters the exclusive nature of Title VII with regard to employees' claims" because of "Title VII's exclusive and comprehensive scheme." *Id.* at 270. The Court concluded that, despite the plaintiff's attempt to invoke a RFRA claim, Title VII affords plaintiffs "the exclusive remedy for job-related claims of federal religious discrimination." *Id.* at 272.

Judge Stapleton's Concurrence in *Francis*, with which the Majority did "not disagree", *id.* at 272 n.7, is of particular relevance here. Judge Stapleton relied on *Brown v. General Services Administration*, 425 U.S. 820 (1976) to highlight the Supreme Court's analysis in enunciating that Title VII provides "the exclusive, pre-emptive [sic] administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 272 (Stapleton, J., concurring) (quoting *Brown*, 425 U.S. at 829). As Judge Stapleton observed, the Supreme Court opined that Title VII should supersede general statutes under the canon of statutory interpretation that resolves tension between specific and general statutes, favoring specific statutes. *Francis*, 505 F.3d at 272 (Stapleton, J., concurring).

Our sister circuits also agree. In *American Energy Corporation v. Rockies Express Pipeline LLC*, the Sixth Circuit concluded that the NGA's reticulated procedure provides that the "relevant court of appeals . . . has 'exclusive' jurisdiction 'to affirm, modify, or set aside [FERC's] order in whole or in part'" and that "no entity may seek judicial review of a FERC order unless it first sought rehearing from the agency." 622 F.3d 602, 605 (6th Cir. 2010) (internal citations omitted). The court emphasized that "[e]xclusive means exclusive, and the [NGA] nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court." *Id.*; *see also La Voz Radio de la Comunidad v. F.C.C.*, 223 F.3d 313, 319 (6th Cir. 2000) (concluding that RFRA "does not provide that the 'judicial proceeding' must be in the district court as opposed to a designated court of appeals" and reasoning that "Congress has equipped the FCC with an impressive arsenal of remedies," of which the "effectiveness . . . would be largely nullified if [plaintiffs] could simply run to the district court and enjoin the FCC from utilizing them"); *Gen. Fin. Corp. v. F.T.C.*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court under 1331 or 1337; the specific statutory method, if adequate, is exclusive.").

---

In addition, the Supreme Court reasoned that, as a practical matter, Title VII's remedial provisions would be entirely undermined "if a plaintiff could circumvent its procedural requirements by 'the simple expedient of putting a different label on the pleadings.'" *Id.* (quoting *Brown*, 425 U.S. at 833).

19

Indeed, the Supreme Court has long held that the Federal Power Act's ("FPA"), statutory review scheme, 16 U.S.C. § 825*l*, which is materially identical to the NGA's,[8] "necessarily preclude[s] de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review," and that challenges brought in the district court outside that scheme are therefore "impermissible collateral attacks." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336, 341 (1958); *see also Me. Council of the Atl. Salmon Fed. v. Nat'l Me. Fisheries Serv.*, 858 F.3d 690, 693 (1st Cir. 2017) (Souter, J., sitting by designation) ("The Supreme Court has made clear that the jurisdiction provided by [the Federal Power Act's jurisdictional provision] is 'exclusive,' not only to review the terms of the specific FERC order, but over any issue 'inhering in the controversy.'" (quoting *City of Tacoma*, 357 U.S. at 336)).

Thus, the District Court did not err in concluding that it lacked subject matter jurisdiction.

**B**

The Adorers further claim that, even if they had indulged the administrative process, they could not have asserted their rights under RFRA within the NGA because they would have had "to have anticipated a possible RFRA violation and affirmatively acted to become a party to a private third

---

[8] The FPA, 16 U.S.C. § 791a, is a statutory scheme recognized as "substantially identical" to the NGA and subject to "interchangeabl[e]" precedent. *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 n.7 (1981).

party's administrative application." Adorers Br. 41-42. We disagree.[9]

The Adorers' contention is unavailing because FERC may hear any claim raised before it—even potential violations of federal law. There is no inherent inhibition to FERC hearing a potential claim in the first instance because it is statutorily granted the authority to hear any claim from an affected party when raised timely. It may adjudicate these claims in a way it believes appropriate. If an affected party disagrees with the adjudication of her claim, she has the opportunity for direct appeal before a federal court of appeals.[10]

---

[9] Our conclusion here should not be interpreted as precluding the filing of a proper freestanding due process claim pursuant to *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976). "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348. This is consistent with *Thunder Basin*'s long-standing observation that a district court may hear claims that are considered "'wholly collateral' to a statute's review provisions and outside the agency's expertise," where a finding of preclusion potentially forecloses all meaningful judicial review. 510 U.S. at 213–14 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). When such a claim arises, it "may be challenged in a district court," as long as it is "entirely collateral" and "the petitioner ha[s] made a colorable showing that full postdeprivation relief could not be obtained." *Id.* at 214 (citations omitted).

[10] As proof of this process, Transco submitted an Order of Rehearing issued by FERC related to the Pipeline Project

21

("28(j) Letter"). The 28(j) Letter indicates that the plaintiffs in that matter requested rehearing on an order issued by FERC authorizing construction and operation of the Pipeline Project, which challenged several potential violations of federal laws. As a result of following the NGA's procedural process, the plaintiffs' claims will be heard by the District of Columbia Circuit Court of Appeals. In our view, the 28(j) Letter provides evidence that, when the procedural process of the NGA is adhered to, all issues—whether dispositive or potential—may be addressed at the agency level. If a party is not satisfied with the result at that level, she may seek review in a court of appeals—as the parties in the 28(j) Letter have done. Had the Adorers likewise taken advantage of the NGA's regime, we see no reason to conclude that they would not have had an opportunity to review their substantive RFRA claims on two levels: at the administrative and the appellate level.

Moreover, just as an objector has a fundamental right to raise concerns prompted by religious beliefs at the administrative level, so, too, FERC bears a commensurate responsibility to carefully consider those objections and to treat respectfully the expression of sincerely-held religious beliefs. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018) (an objector is "entitled to a neutral decisionmaker who w[ill] give full and fair consideration to h[er] religious objection"). Likewise, although we hold today that such objections must be raised in the administrative forum under FERC's exclusive regime to preserve appellate review, nothing in this opinion should be construed to call into question the sincerity of the deeply-held religious beliefs expressed by the Adorers.

If the Adorers had participated in the administrative process, FERC may have denied or modified the conditions of Transco's certificate. Or, if FERC failed to do so, the reviewing court of appeals may have ruled in the Adorers' favor. Under these circumstances, the Adorers would have, at the very least, had the opportunity to seek the relief they so desire today.[11] But because they failed to engage with the NGA's procedural regime, we are without jurisdiction to hear the Adorers' claims.[12]

**IV**

For the foregoing reasons, we hold that a claim under RFRA, 42 U.S.C. § 2000bb-1(c), brought pursuant to the general jurisdictional grant of a federal question under 28 U.S.C. § 1331, does not abrogate or provide an exception to a

---

[11] While RFRA expressly provides for damages, *see* 42 U.S.C. § 2000bb-1, it appears that the NGA circumscribes FERC's authority to issue a ruling on the merits of a certificate of public convenience and necessity, *see* 15 U.S.C. § 717f(e), and the Court of Appeals is similarly limited to "affirming, modifying, or setting aside" the certificate, *id.* § 717r(b). Thus, the ability of a RFRA claimant to receive damages through the NGA process may indeed bear on "whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207. The Adorers did not request damages in their complaint; hence, we need not reach this issue today.

[12] Because we hold that neither the District Court nor this Court have jurisdiction to adjudicate the Adorers' substantive RFRA claim, we need not address their alternative arguments.

specific and exclusive jurisdictional provision prescribed by Congress for judicial review of an agency's action. Accordingly, we shall affirm the order of the District Court granting Transco's and FERC's motions to dismiss.